1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   SHABONDY LAMAR SIMPSON,

11          Petitioner,                    No. CIV S-05-0640 JAM DAD P

12        vs.

13   M. EVANS, Warden,

14          Respondent.                    FINDINGS AND RECOMMENDATIONS

15   _____/

16          Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas

17   corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a judgment of conviction entered

18   against him on October 30, 2000 in the Sacramento County Superior Court on charges of

19   kidnapping and assault.  He seeks relief on the grounds that: (1) his right to due process was

20   violated by the introduction of perjured testimony at his trial; (2) his Sixth and Fourteenth

21   Amendment rights were violated by the trial court's denial of his motion for new trial; (3) he

22   received ineffective assistance of trial and appellate counsel; (4) the prosecutor committed

23   misconduct by allowing one of the prosecution witnesses to give perjured testimony; (5) the

24   prosecutor failed to disclose exculpatory evidence to the defense; and (6) the trial court violated

25   his right to due process when it responded improperly to a question from the jury.  Upon careful

26   /////

1

consideration of the record and the applicable law, the undersigned will recommend that

petitioner's application for habeas corpus relief be denied.

## PROCEDURAL AND FACTUAL BACKGROUND[1]

N.C. started dating defendant in the summer of 1997. She was 17 years old, five feet tall, and weighed 115 pounds. Defendant was 19 years old, six feet tall, and weighed between 170 and 175 pounds. After a couple of months, the relationship turned violent. N.C. put up with the treatment because she "knew no better...."

The events that gave rise to the specific charges of kidnapping and assault occurred on November 19, 1999, and April 29, 2000. At trial, the prosecution introduced evidence about other encounters between defendant and N.C., and between defendant and C.S., a former girlfriend. In addition, N.C. explained why she recanted her allegations against defendant when she testified at the preliminary hearing.

November 19, 1999-Counts One and Two:

N.C. was working for AT & T on Tribute Road in Sacramento County. Defendant telephoned his cousin Toby, who also worked at AT & T, and asked to speak with N.C. Defendant wanted to pick up her car. N .C. told him not to come because she was not going to give him the keys.

Defendant appeared at AT & T a short time later, and N.C. went outside to talk with him. N.C. saw Calvin and Lamar, two of defendant's friends, sitting in an older model Camaro. Defendant again demanded the keys to N.C.'s car. When she refused to hand them over, defendant said, "[Y]ou're not going back to work," grabbed N.C. by the hair, and pushed her into the Camaro.

N.C. tried to get out of the car, but defendant pushed her back by her neck. His fingernails were half an inch long, and left scratches on N.C.'s neck. In response to N.C.'s next attempt to leave the car,

---

[1] The following summary is drawn from the November 19, 2002 opinion by the California Court of Appeal for the Third Appellate District (hereinafter Opinion), filed as Exhibit B to the Answer, at pgs 2-8. This court presumes that the state court's findings of fact are correct unless petitioner rebuts that presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004). "Clear and convincing evidence " within the meaning of § 2254(e) "requires greater proof than preponderance of the evidence" and must produce "an abiding conviction" that the factual contentions being advanced are "highly probable." Cooper v. Brown, 510 F.3d 870, 919 (9th Cir. 2007) (quoting Sophanthavong v. Palmateer, 378 F.3d 859, 866 (9th Cir. 2004). Petitioner has not attempted to overcome the presumption with respect to the underlying events. The court will therefore rely on the state court's recitation of the facts.

2

defendant hit her on the head and slapped her. He told one of his friends to move to the front seat so he could put N.C. in the back seat. When defendant got N.C. into the back seat, he punched her in the head with closed fists.

The driver headed into downtown Sacramento. N.C. asked defendant to let her out of the car, but he refused. The Camaro returned to the AT & T office about 20 minutes later.

Defendant phoned Toby from the car, and asked him to bring out N.C.'s purse, which contained her car keys. He then told N.C., "Get out. We're getting in your car. We're leaving." N.C. took the driver's seat, and defendant directed her to follow the Camaro to Calvin's house. Once there, defendant, Calvin, and Lamar went inside. Although N.C. was alone in the car, she could not drive away because defendant had removed an alarm device that prevented her from starting the engine. She did not flee another way because she was unfamiliar with the area.

When defendant returned, he forced N.C. to drive him to another house and a couple of liquor stores. N.C. later testified, "We basically were just driving around all night, because he didn't want me to go home." At one point, defendant attempted to apologize, saying he was sorry and only did what he did because he loved her. He later asked if she wanted to go to his place. She replied, "No, but I'll drop you off at your house." Defendant got out of the car at his own house, and N.C. drove home.

After reaching home, N.C. called the police. They interviewed her, and took pictures of her injuries. The police also gave N.C. information on how to obtain a restraining order.

April 29, 2000-Counts Three and Four:

On April 29, 2000, N.C. attended a dance at Sacramento State University. Defendant appeared and pulled her by the arm to a corner of the gym. When N.C. asked him to let her go, he grabbed her around the neck and asked, "Bitch, why are you here?" He continued, "You want to be at this dance, acting like a Ho? Well, I'm going to show you how Hos get treated." Defendant scratched and slapped N.C., threw her over his shoulder, and walked out of the gym.

Defendant carried N.C. around the parking lot until he found her car. He told N.C. to drive to Calvin's place. They slept on the floor next to each other, but there was no intimate contact. At one point during the night, N.C. told defendant she did not want to be in a relationship with him anymore. Although N.C. had her car keys, and acknowledged she could have walked out during the night or the following morning, she believed defendant would have forced her to stay.

3

The next morning, N.C. told defendant she wanted to go home. Defendant took the car keys, and told N.C. that she would not be going home. When N.C. asked why he was keeping her there, defendant answered, "Because I know when you go home you and your mom are going to call the police and . . . I'll kill you before I go to prison." Defendant allowed N.C. to go home later that day.

N.C. contacted the Sacramento State University Police Department. They took pictures of her injuries. Later, N.C. learned that defendant had been arrested.

N.C.'s Preliminary Hearing Testimony:

Defendant and his mother, Gwendolyn Simpson, contacted N.C. shortly after defendant's arrest, and pressured her to drop the charges. Mrs. Simpson helped N.C. write letters to defense counsel and the district attorney. With respect to the November 19 incident, she told N.C. to write that she got into the car willingly, that she hit defendant first, and that defendant was just defending himself. With respect to the April 29 incident, Mrs. Simpson told N.C. to write that she and defendant got into an argument, and that she left with him voluntarily.

N.C. testified as a defense witness at the preliminary hearing. Mrs. Simpson told N.C. to repeat what she had said in the letters. Thereafter, N.C. testified that on November 19, 1999, she started the fight with defendant. She also stated that defendant did not force her into the car, but she left with him voluntarily. N.C. explained she told the police that she feared for her life because she was still upset with defendant. Next, N.C. testified that she started hitting defendant during the argument on April 29, 2000, and defendant grabbed her to get her to stop hitting him. At trial, N.C. testified that her letters and preliminary hearing testimony did not accurately reflect what had occurred.

Other Violent Acts Against N.C.:

N.C. described another encounter with defendant in December 1999. He called and came to see N.C. while she was getting her hair done at her cousin's salon. She had not talked to him for a week, and he wanted to know why. When N.C. refused to let defendant take her car, he grabbed her by the neck and began choking her. N.C.'s cousin came in, removed defendant's hands from N.C.'s neck, and ordered defendant to leave. He told N.C. he was not leaving without her. Defendant grabbed her by the arm and took her to her car. She complied with defendant's wishes because she "basically had no other choice."

/////

/////

4

Prior Violent Acts Against C.S.:

At trial, C.S. described similar acts of domestic violence involving defendant. C.S. began dating defendant approximately four years before defendant's jury trial, but the relationship lasted only six months. When C.S. moved home with her father and told defendant she wanted to end the relationship, defendant responded that they "were going to be together, regardless of what [she] wanted."

On May 22, 1997, defendant approached C.S. in the parking lot of her workplace. He asked C.S. why she had not contacted him and what was going on. Defendant grabbed her car keys and told her to get into her car. C.S. got into the driver's seat and drove where defendant directed her. Because she feared defendant, C.S. made up a story that she had to meet her aunt and could not go with him. Defendant told C.S. she would not be keeping the appointment. He eventually allowed C.S. to call her aunt. Defendant told C.S. that she should stop asking to go home, that she would not be going home, and that she would not be going to work the next day.

When defendant and C.S. stopped at a park, he told her that her family needed to stay out of their business and blamed them for their breakup. He told C.S. that if she continued to listen to her family, they would get hurt. C.S. asked to go home, but defendant continued to make her drive around.

Eventually, defendant took C.S. to a Motel 6 where he got a room. The pair continued to argue about his refusing to allow her to go home. Defendant threatened to hurt C.S. if she did not go back to him. Four to five hours later, C.S. promised to call defendant the next day if he let her go. He returned the car keys, and she left.

On June 20, 1997, defendant contacted C.S. a second time in the parking lot at her work. C.S. tried to hurry to her car, but defendant grabbed her keys from her. He took C.S.'s house keys from the key ring. Defendant told her she would not get the keys back unless she met him later. He also told C.S. that if she did not reconcile with him, he would shoot her and her family.

ANALYSIS

I. Standards of Review Applicable to Habeas Corpus Claims

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts. See Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)). A federal writ is not available for alleged error in the

interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991);

Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085.  Habeas

corpus cannot be utilized to try state issues de novo.  Milton v. Wainwright, 407 U.S. 371, 377

(1972).

       This action is governed by the Antiterrorism and Effective Death Penalty Act of

1996 ("AEDPA").  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d

1062, 1067 (9th Cir. 2003).  Section 2254(d) sets forth the following standards for granting

habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court shall
> not be granted with respect to any claim that was adjudicated on
> the merits in State court proceedings unless the adjudication of the
> claim -
>
> (1) resulted in a decision that was contrary to, or involved
> an unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362

(2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).  If the state court's decision

does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review

of a habeas petitioner's claims.  Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008).  See

also Frantz v. Hazey, 513 F.3d 1002, 1013 (9th Cir. 2008) (en banc) ("[I]t is now clear both that

we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such

error, we must decide the habeas petition by considering de novo the constitutional issues

raised.").

       The court looks to the last reasoned state court decision as the basis for the state

court judgment.  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  If the last reasoned

state court decision adopts or substantially incorporates the reasoning from a previous state court

decision, this court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d).  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).  When it is clear that a state court has not reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, the AEDPA's deferential standard does not apply and a federal habeas court must review the claim de novo.  Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

II. Petitioner's Claims

    A. Perjured Testimony

    Petitioner's first claim is that his right to due process was violated by the admission of N.C.'s perjured testimony at his trial.  Petitioner notes that N.C. wrote three letters recanting her allegations against him and testified at the preliminary hearing that he did not kidnap and assault her.  He argues that N.C.'s trial testimony was false.  Petitioner complains that perjury charges were not filed against N.C. even though she admitted lying under oath at his preliminary hearing and also in an  application for a restraining order she obtained against petitioner.  (Pet., Appendix B at 1- 24, 26-39.)  Petitioner has filed a declaration signed under penalty of perjury by his mother, Mrs. Gwen Simpson, wherein she denies that she dictated letters of recantation to N.C. or offered her money to testify falsely that petitioner did not commit the alleged acts.  (Pet., Exs. entitled "Two Sworn declarations by Gwen Simpson.")

    Petitioner raised this due process claim in his habeas petition filed with the Sacramento County Superior Court.  (Answer, Ex. D.)  The Superior Court rejected the claim, reasoning as follows:

> Petitioner first claims that he was unlawfully found guilty of the crimes because the victim had recanted in three letters written before the preliminary hearing, one to the prosecutor and two to the

7

defense team; the victim again recanted at the preliminary hearing; and the prosecutor knowingly had her testify falsely at the trial.

Petitioner, however, fails to prove that the victim's testimony at trial was false. The victim had originally made a statement that petitioner committed the crimes against her, then recanted it in letters and preliminary hearing testimony, then testified at trial that petitioner had committed the crimes and that she had lied at the preliminary hearing because petitioner's mother had offered her money to lie and pressured her to lie. It was for the jury, as finder of fact, to determine which version of the events was the true one – indeed, that is the primary function of a jury at a criminal trial, to sort out and determine the truth. Nor was it unreasonable for the jury to conclude, as it impliedly did, that the victim testified truthfully at the trial itself. Nor does petitioner attach any reasonably available documentary evidence to his petition of evidence to show that the victim's testimony at trial had been untruthful, other than an affidavit from his mother, recently signed under penalty of perjury. In that affidavit, petitioner's mother has now stated under oath that she did not pressure or offer the victim money to testify as the victim did at the preliminary hearing. Defense counsel, however, could have called petitioner's mother as a witness at that point in the trial, as the identity of her was known, to refute the victim's trial testimony, but did not. Nor would it have made any difference in the outcome of the case, as the mother's testimony would have been suspect as both self-serving and an attempt to assist petitioner for obvious reasons, being that she is his mother; further, the evidence of guilt was more than substantial, including that just after both incidents on which the crimes were based occurred, the victim contacted police, who took the victim's statements, and observed and photographed her physical injuries from the crimes. As for other evidence that was presented at the new trial motion hearing to show that the victim was lying, the court has already rejected it as having any potential to have made any difference in the outcome of the case, in denying the new trial motion, and petitioner presents no reason to rule otherwise at this time. As such, petitioner has failed to state a prima facie case for relief, requiring denial of this claim (In re Bower (1985) 38 Cal.3d 865).

(Id. at 1-2.)

The United States Supreme Court "has long held that a conviction obtained using knowingly perjured testimony violates due process." Jackson v. Brown, 513 F.3d 1057, 1071-1072 (9th Cir. 2008) (citing Mooney v. Holohan, 294 U.S. 103, 112 (1935)). See also Napue v. Illinois, 360 U.S. 264 (1959); Morales v. Woodford, 388 F.3d 1159, 1179 (9th Cir. 2004) ("The government's knowing use of perjured testimony to obtain a conviction violates a

8

defendant's right to due process of law.")  A claim for habeas relief based upon the alleged use of perjured testimony to obtain a conviction will only succeed when "(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material."  Jackson, 513 F.3d at 1071-72 (quoting Hayes v. Brown, 399 F.3d 972, 984 (9th Cir. 2005)).  "The essence of the due process violation is misconduct by the government, not merely perjury by a witness."  Morales, 388 F.3d at 1179.

A violation of these due process principles requires that the conviction be set aside whenever there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury."  Hayes, 399 F.3d at 978.  Applying this standard, the Ninth Circuit has observed that "if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic."  Id.  The basic question is "whether . . . [the defendant] received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  Hall v. Dir. of Corr., 343 F.3d 976, 983-84 (9th Cir. 2003) (per curiam).

Petitioner has failed to demonstrate that the prosecutor in his case knowingly permitted the introduction of false testimony from N.C.  Indeed, petitioner actually disclaims making an argument that the prosecutor knew N.C.'s testimony was false.  See Pet., Appendix B, at 37 ("Petitioner does not argue herein that 'The Prosecution knowingly offered perjuried [sic] testimony,' but argues, 'His Conviction is unlawful due to the ongoing False and Perjured Testimony of the Prosecution's Witness "[N.C.]" that had a Substantial Affect on the outcome of the Court Proceedings.'")  Petitioner has also failed to show that N.C.'s trial testimony was actually false.  Evidence that N.C. gave conflicting testimony during the course of the proceedings against petitioner, without more, does not establish that her trial testimony was false.  On the contrary, the fact that N.C. reported the events underlying the criminal charges to police immediately after they occurred tends to support the credibility of her trial testimony.  In addition, as noted by respondent, the inconsistencies between N.C.'s trial testimony and her

9

previous testimony and actions were fully explored at petitioner's trial.  (Reporter's Transcript on Appeal (RT) at 131-41, 157-65, 209-218, 235-42, 250-64, 272-88, 393-436.)  After receiving all of this evidence, the jury chose to believe that N.C. was telling the truth at trial.

Under the circumstances presented here, petitioner has failed to demonstrate that his constitutional rights were violated by the admission of knowingly perjured testimony.  The decision of the Sacramento County Superior Court to the same effect is not contrary to or an unreasonable application of federal law.  Accordingly, petitioner is not entitled to relief on this claim.

B.  Denial of Motion for New Trial

Petitioner's next claim is that his Sixth and Fourteenth Amendment rights were violated by the trial court's denial of his motion for new trial.

The state court record reflects that the trial court held a hearing on petitioner's motion for new trial, at which the defense presented one witness, Teaya Garcia.  (RT at 1041-1116.)  Ms. Garcia testified that N.C. told her prior to trial that during the April 29, 2000 incident, petitioner hit N.C. but did not kidnap her.  (Id. at 1101, 1108.)  N.C. told Garcia that her "mom was making her [report the incident to the police]" and that "[petitioner] did not kidnap her but she didn't think that the police would believe her original story."  (Id. at 1101.)  Ms. Garcia conceded that she and N.C. did not discuss the legal definition of "kidnap."  (Id.)  Garcia also testified that N.C. wanted "Ninevah [Wells]" to come to court and say that she was there at the night of this party at Sacramento State, and Ninevah said that she didn't want to lie under oath and that Nakia was just stupid."  (Id. at 1108.)  Ms. Garcia also testified that she and N.C. intended to go to a party at Sacramento State sometime in April, 2000, but that they were not able to go because another friend couldn't find a babysitter.  (Id. at 1071.)  N.C. also told Garcia that:

> what happened was they had a fight, and the reason she said he
> kidnapped her is that she didn't think they believed the story she
> was originally going to tell them, tell the police or whatever, so she
> said he kidnapped them [sic].  She said he didn't kidnapped [sic]

/////

10

1     her but that what she said she put on the police report because she
2     didn't think they would believe her story.

3 (Id. at 1072.)

4     This court notes that it appears that Ms. Garcia was very reluctant to testify at the

5 hearing on petitioner's motion for a new trial and that her testimony was unspecific and

6 imprecise.  For instance, when she was asked whether she was with N.C. on the night of April

7 29, 2000, when the events at Sacramento State University took place, the following colloquy

8 took place:

9     Q.  (By MR. DIXON) (petitioner's counsel):  Can you recall April
    of this year?
10
    A.  Can I?  Yeah.
11
    Q.  You recall that month?
12
    A.  Yeah.
13
    Q.  Were you going to attend a dance at Sacramento State in April
14     of this year?

15     A.  No.

16     Q.  You never was [sic] going to attend a dance at Sacramento
    State in April of this year?
17
    A.  I was going to, but I didn't go.  I don't remember a specific date
18     so –

19     Q.  But you do remember it was April of this year?

20     A.  Yeah.  I remember it was April because I was barely pregnant,
    but I don't remember a specific date.
21
    Q.  Do you know – were you going to go to the dance with
22     someone else?

23     A.  Yeah.

24     Q.  Whom else were you going to attend the dance with?

25     A.  Niniva and Nakia.

26 /////

1          Q.  And was anyone else going to attend it with the three of you,
           other than the three of you that you just named?
2
           A.  No.
3
           Q.  And did something happen to cause you not to attend that
4          dance in April of this year?

5          A.  I just want to say that I don't – I've been over Niniva's house
           several times and Nakia has been there.  I don't remember any
6          specific dates.  I don't want to say a specific date because I don't
           you know, remember what specific date it was.
7
           But it was in April, and we didn't go because Poo – we couldn't
8          find a babysitter for Poo.  Now, I don't know if this was the same
           party.  I don't know what it was, but I'm really – I really don't want
9          to be involved so –

10    (RT at 1043-44.)

11         Later in the hearing, the following colloquy between counsel and Ms. Garcia

12    occurred:

13         Q.  And have you ever spoken with Nakia about whether or not she
           was kidnapped from a dance at Sacramento State?
14
           A.  Yeah.
15
           Q.  And what has she told you about that?
16
           A.  I really don't want to go into detail with that.
17
           Q.  Has she told you anything about that?
18
           A.  This is none of my business.  It's none of my business, and I
19         don't want – I wasn't there when she was at this party that all this
           stuff happened at, so I really don't feel like going into this.
20

21    (Id. at 1052.)

22         Ms. Garcia also testified at the hearing that N.C. told her the November 19, 1999

23    incident "happened at her job," and that N.C. "was mad and she didn't feel like going back to

24    work, so she left."  (Id. at 1051.)

25         After hearing Ms. Garcia's testimony, the trial court denied petitioner's motion for

26    new trial.  The judge explained his reasoning as follows:

                                          12

Mr. Dixon, the court can certainly understand the defense's desire to bring the motion for new trial when they have information that they believe is exculpatory, but when I listened to Miss Garcia's testimony, it is all over the globe literally as far as what happened and what didn't happen. And for this court to grant the motion for new trial would require me to say that I find her testimony credible and that it is such as would probably render a different result at trial.

And when I look at Miss Garcia's testimony over the number of days that has been here and the way it's been presented and take it in total, it is just not something that the court finds credible when the court looks at it. Under oath she has sworn on multiple occasions here that she doesn't know the day, on multiple other occasions that she is absolutely certain that it is Friday, and now on the most recent occasion that she's absolutely certain that it's Saturday.

She's sworn on multiple occasions that there were multiple parties that she and Nakia and others were contemplating going to, and then she's sworn on other occasions that there was one day with two parties at the same time.

When the court looks at whether this would be any kind of credible testimony that would cause a jury to go and say that the things that have been testified to are unbelievable and are to be disbelieved when she's not saying she ever sees any kind of bruising on this person which would be consistent with her being able to relate soon after the fact something about saying, hey, it happened, the court simply does not find Miss Garcia's testimony to be credible and not finding it to be credible, it doesn't appear to the court that this testimony – even if the court were to grant a new trial – would be something that would result in a different verdict from the court.

This was a fully litigated case where multiple people were presented on both sides. The jury heard the victim's testimony and believed the victim. There's nothing that the court has heard in the motion for new trial that would cause me at this point to start this whole process over and put everybody through it because there's now Miss Garcia who is going to come in and testify under oath all over the globe as to when this was or when this wasn't.

From the Court's standpoint, when I hear the testimony in that fashion, I have to in my own mind say that the court would obviously say Miss Garcia is just confused about the date that she had this particular get–together with [N. C.] and if she's confused about the date, that would not make any credence then to say that [N.C.] could not have been somewhere on April 29th and had this

/////

13

1  particular reported incident happen.  So the court for those reasons
   will deny the motion for new trial.

2

3  (Id. at 1116-17.)

4          The Superior Court ultimately denied relief with respect to petitioner's claim in

5  this regard, reasoning as follows:

6          Petitioner next claims that the trial court erred in denying his new
           trial motion.

7
           The issue could have been but was not raised on appeal, and is
8          therefore barred from habeas corpus review (In re Dixon (1953) 41
           Cal.2d 756, reaffirmed in In re Harris (1993) 5 Cal.4th 813, 829.)
9          The only exceptions to this procedural bar are:  (1) if the claim is
           based on constitutional error that is both clear and fundamental,
10         and that strikes at the heart of the trial process; (2) if the claim is
           now couched in ineffective assistance of counsel terms; (3) if the
11         court lacked fundamental jurisdiction over the petitioner or the
           subject matter; (4) if the court acted in excess of its jurisdiction and
12         the issue is strictly a legal one not requiring a redetermination of
           the facts underlying the claim; or (5) there has been a change in the
13         law affecting the petitioner.  (Harris, supra, 5 Cal.4th 813, 834, 834
           fn. 8, 836, 840-841; In re Antazo (1970) 3 Cal.3d 100, 108
14         [exceptions to Dixon rule are same as those to Waltreus rule]).
           Petitioner does not show that this claim qualifies for any of these
15         exceptions.

16         Regardless, as concluded above, petitioner presents no reason to
           rule any differently than the court initially did in denying the new
17         trial motion.  The court then concluded that the witness presented
           at the hearing was not credible, and petitioner presents nothing new
18         at this time to show otherwise.  Nor does petitioner show that the
           witness would have made any difference in the outcome of the
19         trial, as the evidence of guilt was more than substantial.  The claim,
           therefore, also fails under Bower, supra, even if it were not barred
20         from habeas review under Dixon, supra.

21 (Answer, Ex. D, at 2.)

22         The decision of the Sacramento County Superior Court rejecting petitioner's

23 claim that the trial court violated his constitutional rights in denying his motion for new trial is

24 not contrary to federal law or the facts of this case.  The trial judge denied petitioner's motion for

25 new trial because he did not find Ms. Garcia's testimony credible and did not believe her

26 testimony would have changed the outcome of petitioner's trial.  After reading the transcript of

the hearing on the motion for new trial, this court agrees.  The court does not find any federal

constitutional error in connection with the trial court's denial of petitioner's motion for new trial.

Accordingly, petitioner is not entitled to relief on this claim.[2]

　　　　C.  Ineffective Assistance of Trial and Appellate Counsel

　　　　　　Petitioner claims that he received ineffective assistance of trial and appellate

counsel.  After setting forth the applicable legal standards, the court will evaluate these claims in

turn below.

　　　　　　1.  Legal Standards

　　　　　　The Sixth Amendment guarantees the effective assistance of counsel.  The United

States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

Strickland v. Washington, 466 U.S. 668 (1984).  To support a claim of ineffective assistance of

counsel, a petitioner must first show that, considering all the circumstances, counsel's

performance fell below an objective standard of reasonableness.  466 U.S. at 687-88.  After a

petitioner identifies the acts or omissions that are alleged not to have been the result of

reasonable professional judgment, the court must determine whether, in light of all the

circumstances, the identified acts or omissions were outside the wide range of professionally

competent assistance.  Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003).  Second, a

_____

[2]  After petitioner's motion for new trial was denied, his counsel asked the court for a
postponement of the sentencing proceedings in order to investigate, and possibly subpoena,
several witnesses who had been mentioned by Ms. Garcia during her testimony who could
possibly corroborate her testimony.  (RT at 1118.)  The court asked counsel why he hadn't
obtained affidavits from those persons or arranged for them to appear as witnesses at the hearing.
(Id. at 1119.)  Counsel responded that he had been unable to arrange for the presence of Nineveh
Wells at trial, and had assumed that the testimony of Ms. Garcia would be sufficient to support
the motion for new trial.  (Id. at 1119-20.)  The judge declined to allow defense counsel to "look
for further evidence," observing that he found Ms. Garcia's testimony incredible, that none of the
witnesses would be competent to testify as to whether petitioner's actions did or did not
constitute a kidnaping, and that the information from Nineveh Wells was known to counsel at the
time of the trial and could have been obtained at that time.  (Id. at 1120-23.)  After a review of
the record, this court finds no federal constitutional violation resulted from the trial court's denial
of petitioner's request to postpone a final ruling on the motion for new trial in order to pursue
additional witnesses.

petitioner must establish that he was prejudiced by counsel's deficient performance.  <u>Strickland</u>, 466 U.S. at 693-94.  Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  <u>Id.</u> at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  <u>Id.</u>  <u>See also</u> <u>Williams</u>, 529 U.S. at 391-92; <u>Laboa v. Calderon</u>, 224 F.3d 972, 981 (9th Cir. 2000).  A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed."  <u>Pizzuto v. Arave</u>, 280 F.3d 949, 955 (9th Cir. 2002) (quoting <u>Strickland</u>, 466 U.S. at 697).

Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  <u>Strickland</u>, 466 U.S. at 691.  "This includes a duty to . . . investigate and introduce into evidence records that demonstrate factual innocence, or that raise sufficient doubt on that question to undermine confidence in the verdict."  <u>Bragg v. Galaza</u>, 242 F.3d 1082, 1088 (9th Cir. 2001) (citing <u>Hart v. Gomez</u>, 174 F.3d 1067, 1070 (9th Cir. 1999)).  In this regard, it has been recognized that "the adversarial process will not function normally unless the defense team has done a proper investigation."  <u>Siripongs v. Calderon (Siripongs II)</u>, 133 F.3d 732, 734 (9th Cir. 1998) (citing <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 384 (1986)).  Therefore, counsel must, "at a minimum, conduct a reasonable investigation enabling him to make informed decisions about how best to represent his client."  <u>Hendricks v. Calderon</u>, 70 F.3d 1032, 1035 (9th Cir. 1995) (quoting <u>Sanders v. Ratelle</u>, 21 F.3d 1446, 1456 (9th Cir. 1994) (internal citation and quotations omitted). On the other hand, where an attorney has consciously decided not to conduct further investigation because of reasonable tactical evaluations, his or her performance is not constitutionally deficient.  <u>See</u> <u>Siripongs II</u>, 133 F.3d at 734; <u>Babbitt v. Calderon</u>, 151 F.3d 1170, 1173 (9th Cir. 1998); <u>Hensley v. Crist</u>, 67 F.3d 181, 185 (9th Cir. 1995).  "A decision not to investigate thus

'must be directly assessed for reasonableness in all the circumstances.'" <u>Wiggins</u>, 539 U.S. at

533 (quoting <u>Strickland</u>, 466 U.S. at 691).  <u>See</u> also <u>Kimmelman</u>, 477 U.S. at 385 (counsel

"neither investigated, nor made a reasonable decision not to investigate"); <u>Babbitt</u>, 151 F.3d at

1173-74.  A reviewing court must "examine the reasonableness of counsel's conduct 'as of the

time of counsel's conduct.'" <u>United States v. Chambers</u>, 918 F.2d 1455, 1461 (9th Cir. 1990)

(quoting <u>Strickland</u>, 466 U.S. at 690).  Furthermore, "'ineffective assistance claims based on a

duty to investigate must be considered in light of the strength of the government's case.'" <u>Bragg</u>,

242 F.3d at 1088 (quoting <u>Eggleston v. United States</u>, 798 F.2d 374, 376 (9th Cir. 1986)).

      In assessing an ineffective assistance of counsel claim "[t]here is a strong

presumption that counsel's performance falls within the 'wide range of professional assistance.'"

<u>Kimmelman</u>, 477 U.S. at 381 (quoting <u>Strickland</u>, 466 U.S. at 689).  There is in addition a strong

presumption that counsel "exercised acceptable professional judgment in all significant decisions

made." <u>Hughes v. Borg</u>, 898 F.2d 695, 702 (9th Cir. 1990) (citing <u>Strickland</u>, 466 U.S. at 689).

      The <u>Strickland</u> standards apply to appellate counsel as well as trial counsel.  <u>Smith</u>

<u>v. Murray</u>, 477 U.S. 527, 535-36 (1986); <u>Miller v. Keeney</u>, 882 F.2d 1428, 1433 (9th Cir. 1989).

However, an indigent defendant "does not have a constitutional right to compel appointed

counsel to press nonfrivolous points requested by the client, if counsel, as a matter of

professional judgment, decides not to present those points." <u>Jones v. Barnes</u>, 463 U.S. 745, 751

(1983).  Counsel "must be allowed to decide what issues are to be pressed." <u>Id.</u>  Otherwise, the

ability of counsel to present the client's case in accord with counsel's professional evaluation

would be "seriously undermined." <u>Id.</u>  <u>See</u> also <u>Smith v. Stewart</u>, 140 F.3d 1263, 1274 n.4 (9th

Cir. 1998) (counsel not required to file "kitchen-sink briefs" because it "is not necessary, and is

not even particularly good appellate advocacy.")  There is, of course, no obligation to raise

meritless arguments on a client's behalf.  <u>See</u> <u>Strickland</u>, 466 U.S. at 687-88 (requiring a

showing of deficient performance as well as prejudice).  Thus, counsel is not deficient for failing

to raise a weak issue.  <u>See</u> <u>Miller</u>, 882 F.2d at 1434.  In order to demonstrate prejudice in this

context, petitioner must show that, but for appellate counsel's errors, he probably would have prevailed on appeal. Id. at 1434 n.9.

### 2. Trial Counsel

Petitioner claims that his trial counsel rendered ineffective assistance by failing to "conduct an adequate investigation and subpoena witnesses in support of an acquittal to the false kidnap/assault allegations." (Pet., Appendix B, at 47.) He specifically complains that his trial counsel failed to "address the court" regarding the fact that N.C. did not testify truthfully at trial, and failed to move to exclude N.C.'s testimony based on her admission that she had made "false accusations of criminal conduct against petitioner." (Id. at 48.) Petitioner also argues that his trial counsel should have: (1) called Nineveh Wells as a trial witness to testify that she informed the prosecutor she did not go to the party with N.C. on April 29, 2000, as N.C. had testified; (2) investigated whether petitioner called N.C. from jail and pressured her to drop the charges against him and whether petitioner's mother pressured N.C. and offered her money to drop the charges against petitioner, as N.C. testified at trial; (3) called as witnesses the two men who were in the car during the November 19, 1999 incident to testify that "what [N.C.] testified to, did not occur;" and (4) requested that N.C. be ordered to appear at the hearing on petitioner's motion for new trial "to be brought up on Perjury Charges and/or to order her to answer to the accusations Ms. Garcia had just testified to." (Id. at 48-52.) Petitioner also states that his trial counsel had been suspended from the practice of law for more than three years at the time that petitioner retained him. (Id. at 53.)

The Sacramento County Superior Court rejected each of petitioner's claims of ineffective assistance of counsel, reasoning as follows:

> Petitioner next claims that he was rendered ineffective assistance of trial counsel, in counsel's failure to adequately investigate and subpoena witnesses, and in not moving to exclude the victim's testimony as perjured. As concluded above, it was for the jury and not the court to determine which version of events relayed by the victim at different times was the truth and which was a falsity. It is often the case that a witness will give different versions of an event

1　　　at different times; it is the function of the jury to determine which
　　　parts of which versions represent the truth and which do not, and
2　　　the prosecutor may present the testimony at trial if the prosecutor
　　　has reason to believe that the testimony to be given at trial is true.
3　　　It was not ineffective, therefore, for the defense counsel to have
　　　failed to move to preclude the victim from testifying at trial, as the
4　　　motion would have been denied.  As for the witnesses counsel
　　　failed to present, as concluded above the possible testimony of
5　　　neither of these witnesses would have made a difference in the
　　　outcome of the trial.  The claim, therefore, fails under Bower,
6　　　supra, and Strickland v. Washington (1984) 466 U.S. 668.

7　　　Petitioner next claims that the judgment should be reversed
　　　because his retained counsel, Thomas Dixon, had been suspended
8　　　from practicing law when petitioner retained him.  Petitioner,
　　　however, does not attach any reasonably available documentary
9　　　evidence in support (In re Harris, supra, 5 Cal.4th 813, 827 fn. 5).
　　　Indeed, the California State Bar's website on the Internet, of which
10　　　this court takes judicial notice pursuant to Evid. Code § 452(h),
　　　indicates the opposite, that Mr. Dixon was returned to active status
11　　　with the Bar on March 11, 1998, and was not again suspended by
　　　the Bar until September 1, 2001.  Mr. Dixon represented petitioner
12　　　from August 4, 2000 through March 12, 2001, well within the time
　　　period during which Mr. Dixon was on active status with the Bar.
13　　　The claim therefore fails under Bower, supra.

14　(Answer, Ex. D at 3.)

15　　　　　Petitioner has failed to demonstrate that he received ineffective assistance of trial

16　counsel.  First, petitioner's trial counsel did not render ineffective assistance by failing to have

17　N.C.'s trial testimony stricken as false.  Counsel effectively cross-examined N.C. regarding the

18　inconsistencies between her trial testimony, her testimony at the preliminary examination and her

19　other statements.  Counsel was not required to made a meritless motion to exclude the testimony

20　of this witness.  Strickland, 466 U.S. at 687-88.  With respect to the witnesses petitioner alleges

21　his trial counsel should have obtained, he has failed to demonstrate that these witnesses would

22　have testified consistently with petitioner's version of the events.  Although petitioner speculates

23　that their testimony would have been helpful to him, he does not provide any evidence of what

24　they would have said.  Under those circumstances, petitioner cannot demonstrate that his

25　counsel's tactical decision not to call these witnesses was detrimental to the defense.  See

26　Jackson v. Calderon, 211 F.3d 1148, 1159-60 (9th Cir. 2000); Villafuerte v. Stewart, 111 F.3d

616, 632 (9th Cir. 1997) (petitioner's ineffective assistance claim denied where he presented no evidence concerning what counsel would have found had he investigated further, or what lengthier preparation would have accomplished); Ceja v. Stewart, 97 F.3d 1246, 1255 (9th Cir. 1996) (no ineffective assistance where petitioner failed to explain "what compelling evidence additional interviews would have unearthed or to explain how an investigation of aggravation evidence would have negated the evidence of the multiple gunshot wounds"); United States v. Harden, 846 F.2d 1229, 1231-32 (9th Cir. 1988) (no ineffective assistance because of counsel's failure to call a witness where, among other things, there was no evidence in the record that the witness would testify); United States v. Berry, 814 F.2d 1406, 1409 (9th Cir. 1987) (appellant failed to meet prejudice prong of ineffectiveness claim because he offered no indication of what potential witnesses would have testified to or how their testimony might have changed the outcome of the hearing).

Petitioner has failed to establish prejudice with respect to his claims that his trial counsel rendered ineffective assistance when he failed to properly investigate whether petitioner or his mother pressured N.C. to recant her accusations against petitioner, as N.C. testified at trial. Petitioner has not shown a reasonable probability that, but for counsel's failure to conduct such investigation, the result of the proceedings would have been different. In addition, "[a]s a matter of trial strategy, counsel could well decide not to call family members as witnesses because family members can be easily impeached for bias." Bergmann v. McCaughtry, 65 F.3d 1372, 1380 (7th Cir. 1995). Petitioner's claim that he received ineffective assistance because his trial counsel had been suspended from the practice of law lacks a factual basis and should also be rejected. The Sacramento County Superior Court ascertained that petitioner's trial counsel was an active member of the State Bar at the time he was representing petitioner, and petitioner has not refuted these factual findings in the petition or traverse. See also United States v. Ross, 338 F.3d 1054, 1056-57 (9th Cir. 2003) (an attorney's suspension from practice prior to the start of petitioner's criminal proceedings is not per se ineffective assistance of counsel); United States v.

Mouzin, 785 F.2d 682, 698 (9th Cir. 1986) (an attorney's disbarment during petitioner's criminal proceedings did not violate petitioner's Sixth Amendment right to effective assistance of counsel); United States v. Hoffman, 733 F.2d 596 (9th Cir. 1984) (an attorney's suspension from practice does not automatically violate petitioner's Sixth Amendment right to effective assistance of counsel); Osumi v. Giurbino, 445 F. Supp. 2d 1152, 1161-62 (C.D. Cal. 2006) ("to show an attorney was ineffective, the petitioner must show incompetence or ineffective[ness] in his trial, not in some unrelated proceeding.").

For all of the above-described reasons, petitioner is not entitled to relief on his claim that his trial counsel rendered ineffective assistance.

3. Appellate Counsel

Petitioner claims that his appellate counsel rendered ineffective assistance by failing to raise on appeal the issues that he raises in the instant petition. (Pet., Appendix B at 73-74.) Relief with respect to this claim should also be denied. Appellate counsel's decision to press only issues on appeal that he believed, in his professional judgment, had more merit than the claims suggested by petitioner was "within the range of competence demanded of attorneys in criminal cases." McMann v. Richardson, 397 U.S. 759, 771 (1970). There is no evidence in the record that appellate counsel's investigation into possible meritorious issues to raise on appeal was incomplete, that a more thorough investigation would have revealed other meritorious issues on appeal, or that appellate counsel's decision not to raise the claims contained herein fell below an objective standard of reasonableness. In addition, this court has not found merit in any of the claims raised in the instant petition. Appellate counsel has no obligation to raise meritless issues on appeal. Strickland, 466 U.S. at 687-88. The state court determination with regard to petitioner's claim of ineffective assistance of appellate counsel is not contrary to, or an unreasonable application of Strickland. Accordingly, petitioner is not entitled to habeas relief on that claim.

/////

D. Prosecutorial Misconduct

Petitioner claims that the prosecutor committed misconduct by allowing N.C. to give perjured testimony at trial. (Pet., Appendix B, at 55-60.) He argues that the prosecutor should have known N.C.'s trial testimony was false because of the contrary testimony she gave at his preliminary examination regarding the alleged events. (Id.) Petitioner points to specific inconsistencies in N.C.'s various statements, including her assertion that petitioner pressured her over the telephone while he was in jail to recant her allegations. Petitioner faults the prosecutor for failing to introduce telephone records to prove whether petitioner spoke to N.C. from jail, and claims that the prosecutor should have conducted additional investigation in order to verify or disprove her testimony at trial. (Id.)

A defendant's due process rights are violated when a prosecutor's misconduct renders a trial fundamentally unfair. Darden v. Wainwright, 477 U.S. 168, 181 (1986). However, such misconduct does not, per se, violate a petitioner's constitutional rights. Jeffries v. Blodgett, 5 F.3d 1180, 1191 (9th Cir. 1993) (citing Darden, 477 U.S. at 181, and Campbell v. Kincheloe, 829 F.2d 1453, 1457 (9th Cir. 1987)). Claims of prosecutorial misconduct are reviewed "'on the merits, examining the entire proceedings to determine whether the prosecutor's [actions] so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995) (citation omitted). See also Greer v. Miller, 483 U.S. 756, 765 (1987); Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974); Turner v Calderon, 281 F.3d 851, 868 (9th Cir. 2002). Relief on such claims is limited to cases in which the petitioner can establish that prosecutorial misconduct resulted in actual prejudice. Johnson, 63 F.3d at 930 (citing Brecht, 507 U.S. at 637-38); see also Darden, 477 U.S. at 181-83; Turner, 281 F.3d at 868. Put another way, prosecutorial misconduct violates due process when it has a substantial and injurious effect or influence in determining the jury's verdict. See Ortiz-Sandoval v. Gomez, 81 F.3d 891, 899 (9th Cir. 1996).

/////

As explained above, petitioner has failed to demonstrate that the prosecutor knew N.C.'s trial testimony was false. On the contrary, as noted above, her testimony was supported by other evidence introduced at trial, including the fact that after both assaults petitioner contacted the police and the police obtained contemporaneous photographs of her injuries. As observed by the Superior Court, "the prosecutor may present the testimony at trial if the prosecutor has reason to believe that the testimony to be given at trial is true." (Answer, Ex. D, at 3.) It is true that N.C. made conflicting statements during the course of the proceedings against petitioner, at times accusing him and at other times recanting those accusations. However, all of the conflicting testimony and statements were placed before the jurors, who believed that N.C. was telling the truth at trial notwithstanding her prior recantations. With respect to petitioner's claims regarding whether or not he called N.C. from jail and pressured her to recant her allegations against him, petitioner has failed to demonstrate that pertinent telephone records exist or would be helpful to him. Under the circumstances presented here, petitioner has not shown that the prosecutor committed misconduct or that any such misconduct resulted in prejudice. Accordingly, petitioner is not entitled to relief on this claim.[3]

---

[3] In his traverse, petitioner argues for the first time that the prosecutor improperly "vouched" for the truthfulness of N.C.'s testimony by failing to correct "her false statements and perjured testimony." (Traverse at 18.) To the extent petitioner is attempting to belatedly raise a new claim in the traverse, relief should be denied. See Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994) (a traverse is not the proper pleading to raise additional grounds for relief); Greenwood v. Fed. Aviation Admin., 28 F.3d 971, 977 (9th Cir. 1994) ("we review only issues which are argued specifically and distinctly in a party's opening brief"). Even if a claim of improper vouching had been properly raised, petitioner has failed to demonstrate a constitutional violation. Improper vouching typically occurs in two situations: (1) the prosecutor places the prestige of the government behind a witness by expressing his or her personal belief in the veracity of the witness, or (2) the prosecutor indicates that information not presented to the jury supports the witness' testimony. United States v. Young, 470 U.S. 1, 7 n.3 (1985); King v. Schriro, 537 F.3d 1062, 1068-69 (9th Cir. 2008); United States v. Hermanek, 289 F.3d 1076, 1098 (9th Cir. 2002). Neither of these situations are present in this case. The prosecutor's alleged failure to "correct" N.C.'s testimony does not constitute improper vouching in any event. Petitioner also claims in his traverse that the prosecutor committed misconduct by calling an expert witness to testify that victims of abuse frequently make inconsistent statements, arguing that the testimony tended to "inflame the passions of the jurors." (Traverse at 19.) Even assuming this claim had been properly raised, petitioner has failed to demonstrate a federal constitutional violation. The introduction of this expert's testimony did not render petitioner's trial fundamentally unfair. Accordingly, he is not entitled to relief on this claim.

E.  Brady Claim

Petitioner claims that the prosecutor failed to disclose exculpatory information to the defense in the form of "detailed statements taken by investigating police that could have cleared petitioner of kidnapping charges." (Pet., Appendix B at 60.)  Petitioner is specifically referring to two interviews of N.C. conducted by police officer Humble: one on March 20, 2000, and the other on May 2, 2000.  (Id. at 68.)

At petitioner's preliminary hearing, Officer Humble testified that he interviewed N.C. on March 20, 2000, after N.C. had called the police and reported that petitioner had violated a restraining order by forcing his way into her car when she was on her way to work.  (Clerk's Transcript on Appeal (CT) at 60-63.)  At that time N.C. told Officer Humble that petitioner rummaged through her purse on the way to N.C.'s place of employment and that he stayed in the car for approximately 30 minutes after she went into the building, at which time he was picked up by a friend.  (Id. at 61-62.)  On cross-examination Officer Humble testified that he asked N.C. whether she reported this incident to her employer but did not put her response into his written report because he didn't feel it was important.  (Id. at 62.)  Humble also testified that N.C. was "more or less convinced by her mother to call law enforcement;" that he did not check N.C.'s car for fingerprints in order to verify that petitioner had been in the car; and that he did not note in his report that N.C. and petitioner had been "seeing each other off and on as boy and girl friends" during the time the restraining order was in effect, because he didn't feel it was important to do so.  (Id. at 62-67.)  Petitioner argues that Officer Humble "failed to exercise due care as a public entity by failing to document statements told to him by [N.C.] that could have been utilized as factual material evidence in behalf of the Petitioner's Defense and Trial to challenge the 'Credibility' of [N.C.'s] Conduct and fabricated statements she reported on March 20, 2000." (Pet., Appendix B, at 63.)  Petitioner's claim before this court is that the prosecutor committed misconduct by failing to bring all of the above-described information to the attention of the jury, arguing that it would have "provided evidence in support of Petitioner's case by showing [N.C.]

cannot be believed, and therefore this evidence could have been used to discredit her kidnapping allegations."  (Id. at 64.)

Petitioner also claims that Officer Humble interviewed N.C. and petitioner at the home of petitioner's mother after N.C. had made the kidnapping allegations concerning the events of April 29, 2000.  (Id. at 64.)  Petitioner states that during that conversation, N.C. denied that petitioner had ever kidnapped her.  (Id. at 65.)  Officer Humble told petitioner that "because of statements  [N.C.] had just given to him, he made the decision not to Arrest Petitioner."  (Id. at 66.)  Officer Humble then told petitioner that he would not arrest him at that time, but would make a written report and "inform the Court and the District Attorney's Office" that petitioner had never kidnapped N.C.  (Id.)  Petitioner complains that Officer Humble was not present in court when petitioner was later detained for the kidnapping on April 29, 2000,

> nor were any Police and/or Investigation Reports submitted into evidence in behalf of petitioner, Nor did it appear the Court or the District Attorney's Office had been informed of any Investigating Reports by Officer Humble, that he told Petitioner he would inform them of.

(Id. at 67.)  Petitioner also notes that Officer Humble did not explain any of these events when he testified at the preliminary hearing.  (Id.)  Petitioner claims that the prosecutor intentionally withheld this information "during the Preliminary Hearing, Discovery Process, and the entire . . . trial."  (Id. at 67-68.)

This court has been unable to find evidence in the record before it that petitioner exhausted this claim in state court.  However, even if this claim was not properly exhausted by presentation to the California Supreme Court, relief should still be denied pursuant to 28 U.S.C. § 2254(b)(2) ("[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State").  See also Cassett v. Stewart, 406 F.3d 614, 624 (9th Cir. 2005) (a federal court considering a habeas petition may deny an unexhausted claim on the merits when it is perfectly clear that the claim is not "colorable").

In Brady v. Maryland, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. See also Bailey v. Rae, 339 F.3d 1107, 1113 (9th Cir. 2003). The duty to disclose such evidence is applicable even though there has been no request by the accused, United States v. Agurs, 427 U.S. 97, 107 (1976), and encompasses impeachment evidence as well as exculpatory evidence. United States v. Bagley, 473 U.S. 667, 676 (1985). A Brady violation may also occur when the government fails to turn over evidence that is "known only to police investigators and not to the prosecutor." Youngblood v. West Virginia, 547 U.S. 867, 869-70 (2006) (quoting Kyles v. Whitley, 514 U.S. 419, 437, 438 (1995)) ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"). See also Tennison v. City and County of San Francisco, 548 F.3d 1293, 1301 (9th Cir. 2008) (Brady imposes a duty on prosecutors and on police officers to disclose exculpatory evidence). There are three components of a Brady violation: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; the evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999). See also Banks v. Dretke, 540 U.S. 668, 691 (2004); Silva v. Brown, 416 F.3d 980, 985 (9th Cir. 2005).

In order to establish prejudice resulting from a Brady violation, a petitioner must demonstrate that "'there is a reasonable probability' that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." Strickler, 527 U.S. at 289. "The question is not whether petitioner would more likely than not have received a different verdict with the evidence, but whether "in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." (Id.) (quoting Kyles, 514 U.S. at 434). See also United States v. Bond, 552 F.3d 1092, 1097 (9th Cir. 2009) ("[t]he animating purpose of

Brady is to preserve the fairness of criminal trials") (quoting Morris v. Ylst, 447 F.3d 735, 742 (9th Cir. 2006)); Silva, 416 F.3d at 986 ("a Brady violation is established where there 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'")  Once the materiality of the suppressed evidence is established, no further harmless error analysis is required.  Kyles, 514 U.S. at 435-36; Silva, 416 F.3d at 986.  "When the government has suppressed material evidence favorable to the defendant, the conviction must be set aside."  Silva, 416 F.3d at 986.

Petitioner has failed to demonstrate that the prosecutor or the police committed a Brady violation in his case.  The court first notes that petitioner was aware prior to trial of all of the alleged exculpatory evidence that was in the possession of Officer Humble because he himself was present when many of the statements in question were made to the officer.  Petitioner could have called Officer Humble as a witness at trial if he believed his testimony was important.  See Bond, 552 F.3d at 1097 (denying Brady claim because "Bond merely could have subpoenaed Johnson on his own had he thought that the witness had anything exculpatory to say"); United States v. Aichele  941 F.2d 761, 764 (9th Cir. 1991) ("When a defendant has the opportunity to present impeaching evidence to the jury, as Aichele did here, there is no prejudice in the preparation of his defense");  United States v. Gordon, 844 F.2d 1397, 1402 (9th Cir. 1988) (substantial opportunity to use information at trial cures any prejudice caused by delayed disclosure).  There is also no evidence that Officer Humble intentionally destroyed evidence or deliberately failed to include important information in his written reports.  As described above, Officer Humble testified at the preliminary hearing that he did not report N.C.'s response when he asked her whether she reported the 1999 incident to her employer, and did not note in his report that N.C. and petitioner had been "seeing each other off and on as boy and girl friends" while the restraining order was in effect, because he did not feel it was important to do so.  (CT at 62, 67.)  His judgment in this regard was not unreasonable and, in any event, did not result in petitioner being unaware of the information.

27

Petitioner has also failed to demonstrate a reasonable probability that the result of the trial would have been different if the information in question had been included in Officer Humble's reports. As described above, the evidence introduced at petitioner's trial made clear that N.C. had made numerous accusations against petitioner, had withdrawn some of those accusations, and had changed her mind again by the time of trial. Evidence of similar conduct and inconsistent statements in Officer Humble's written reports would not have made a difference to the outcome of petitioner's trial. Accordingly, petitioner is not entitled to relief on his claim that the prosecutor failed to disclose exculpatory evidence to the defense.

F. <u>Erroneous Response to Jury Question</u>

In a related claim, petitioner argues that the information in the possession of Officer Humble, described above, should have been disclosed to the jurors after they sent a note to the judge during deliberations asking to review "police reports." (Pet., Appendix B, at 69.) He argues that the information would have helped the jury to determine which of N.C.'s statements and allegations were true and which were false. (<u>Id.</u>)

The record reflects that the jurors made the following request OF THE COURT during THEIR deliberations:

> If the police make a report and take pictures of a victim, is taking of the pictures included in the report? Is there a record of when the photos were taken? Can we see the police reports? Can we see photos of Mr. Simpson when he was arrested?

(CT at 178.) The trial court issued the following response to the jury's note:

> You have received the evidence and must determine the case based on the evidence received (which includes the stipulations and matters judicially noticed). The police reports are themselves hearsay and not evidence. Neither side offered in evidence any photos of Mr. Simpson when he was arrested.

(<u>Id.</u> at 179.)

Petitioner argues that, contrary to the court's response to the jury's inquiry, police reports are "evidence" and that the failure to provide this material to the jury "removed a huge

burden from the Prosecution's Case, simply because those reports read that "Shabondy Simpson did not kidnap me at anytime."  (Pet., Appendix B, at 70.)

Petitioner is claiming, in essence, that the trial court issued an improper instruction to the jury in response to its request for further information.  Respondent states that petitioner presented this claim to the California Supreme Court, which rejected it on the merits. (Answer at 21.)  This court has been unable to find evidence in the record before it that petitioner exhausted this claim in state court.  However, even if the claim is unexhausted, it should be denied pursuant to 28 U.S.C. § 2254(b)(2).

In order to warrant federal habeas relief, a challenged jury instruction "cannot be merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due process right guaranteed by the fourteenth amendment."  Prantil v. State of Cal., 843 F.2d 314, 317 (1988) (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973)).  To prevail, petitioner must demonstrate that an erroneous instruction "'so infected the entire trial that the resulting conviction violates due process.'"  Estelle, 502 U.S. at 72 (quoting Cupp, 414 U.S. at 147).

Petitioner is not entitled to relief on his claim that Officer Humble's reports should have been disclosed to the jury in response to the jury's inquiry during its deliberations. First, the jury appeared to be interested mainly in photographs.  Officer Humble did not appear to be in possession of any photographs and his reports, including observations which were not recorded in his written report, would not have been responsive to the jury's question.  Second, the trial court accurately and correctly informed the jurors that they were required decide the case based on the evidence introduced at trial and that neither police reports nor photographs were introduced into evidence.  In short, the trial court's response to the jury's question was reasonable and did not result in a due process violation.  Accordingly, petitioner is not entitled to relief on this claim.

/////

/////

G. Evidentiary Hearing

Petitioner requests an evidentiary hearing on his claims. (Pet., Appendix B, at 36-39, 46, 72; Traverse at 4-5.) Pursuant to 28 U.S.C. § 2254(e)(2), a district court presented with a request for an evidentiary hearing must first determine whether a factual basis exists in the record to support a petitioner's claims and, if not, whether an evidentiary hearing "might be appropriate." Baja v. Ducharme, 187 F.3d 1075, 1078 (9th Cir. 1999). See also Earp v. Ornoski, 431 F.3d 1158, 1166 (9th Cir. 2005; Insyxiengmay v. Morgan, 403 F.3d 657, 669-70 (9th Cir. 2005). A habeas petitioner must, however, "allege[] facts that, if proved, would entitle him to relief." Schell v. Witek, 218 F.3d 1017, 1028 (9th Cir. 2000). Petitioner has not demonstrated that any additional facts need to be determined in order to resolve the claims raised in the instant petition. Further, this court has determined that relief as to petitioner's claims should be denied on the merits because the decisions of the state courts were not contrary to, or an unreasonable application of, clearly established federal law or based on an unreasonable determination of the facts. Accordingly, an evidentiary hearing is not warranted on petitioner's claims. See Williams, 529 U.S. at 445; Earp, 431 F.3d 1166.

CONCLUSION

For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised

/////

/////

that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: April 30, 2009.

_____
DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:8
simpson640.hc

31